# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| RANDY LEE GROVES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:14-1146 |
| | ) | Senior Judge Haynes |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff, Randy Lee Groves, filed this action under 42 U.S.C. § 405(g) against the Defendant Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the Commissioner's denial of his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.

Before the Court is Plaintiff's motion for judgment on the Administrative Record (Docket Entry No. 14), to which the Commissioner filed her Response (Docket Entry No. 15), to which Plaintiff filed his reply (Docket Entry No. 16). In his Motion, Plaintiff contends that the ALJ erred by failing (1) to include a function-by-function assessment in the RFC assessment; (2) to consider properly the opinion of Robertson Nash, Plaintiff's nurse practitioner ("NP"); and (3) to perform a proper credibility analysis. (Docket Entry No. 14-1 at 1-2). As an alternative, Plaintiff seeks a remand for further consideration by a new Administrative Law Judge ("ALJ"). (Docket Entry No. 14 at 1). The Commissioner argues that the ALJ's decision is supported by substantial evidence. (Docket Entry No. 15 at 4).

Plaintiff previously filed applications for DIB and SSI benefits that after a hearing an ALJ

denied. (Docket Entry No. 11, Administrative Record, at 107-15)[1]. The ALJ determined that Plaintiff

had the following severe impairments: HIV infection, headaches, chronic obstructive pulmonary

disorder ("COPD"), and scoliosis. Id. at 109. The ALJ, however, found that Plaintiff did not have

an impairment or combination of impairments that met or medically equaled one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 110. The ALJ also found that

Plaintiff had the residual functional capacity ("RFC") to perform light work, except that he had

"postural limitations that restrict climbing, balancing, stooping, crouching, kneeling, and crawling

to only occasionally," and that he must "avoid irritating inhal[a]nts." Id. at 111. The ALJ found that,

although Plaintiff was unable to perform any past relevant work, jobs existed in significant numbers

in the national economy that Plaintiff can perform, considering his age, education, work experience,

and RFC. Id. at 113-14. The ALJ therefore found that Plaintiff was not disabled. Id. at 114.

Plaintiff's second applications for DIB and SSI benefits initially were denied on November

18, 2010 and after reconsideration on April 12, 2011. Id. at 123-30, 137-44. Plaintiff filed a timely

written request for a hearing before an ALJ and after a hearing the ALJ denied Plaintiff's claims,

based upon the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act only through December 31, 2010.

2.      The claimant has not engaged in substantial gainful activity since October 15, 2009, the amended alleged onset date (20 CFR 404.1571 *et. seq.*, and 416.971 *et. seq.*).

3.      The claimant has the following severe impairments: HIV Infection; Headache Disorder; Chronic Obstructive Pulmonary Disease (COPD); Scoliosis; Major Depressive Disorder; Alcohol Dependency, newly in remission per self-report

---

[1]The Court's citations are to the pagination in the Administrative Record, not in the electronic case filing system.

(20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), including the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit for about six hours, stand and/or walk for about six hours, except as follows: The claimant is limited to jobs requiring only occasional posturals of climbing, balancing, stooping, crouching, kneeling, or crawling, and is to avoid exposure to pulmonary irritants (such as fumes, odors, dusts, gasses, or similar items). From a mental perspective, the claimant is further limited to simple and unskilled jobs that requiring [sic] no more than the ability to understand, remember and carry out one to three step instructions. He would be able to maintain concentration, persistence and pace for such jobs for two hours at a time with customary work breaks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 12, 1965 and was 44 years old, which is defined as a younger individual (age 18-49), on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Id. at 14-28. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council that was denied. Id. at 1-3. The Appeals Council's denial rendered the ALJ's decision the Commissioner's final decision. Id. at 1.

## A. Review of the Record

Plaintiff is fifty years old and completed the eighth grade before later obtaining a general education diploma. Id. at 45, 117-20. The Administrative Record contains Plaintiff's medical records that predate Plaintiff's amended alleged onset date of October 15, 2009. In May 2005, Plaintiff was diagnosed with an HIV-1 infection and began receiving regular HIV observation and psychiatric care at Vanderbilt Comprehensive Care Center ("CCC") in June 2005. Id. at 268, 416-18. Records prior to Plaintiff's onset date provide context to Plaintiff's current DIB and SSI claims, but were considered in Plaintiff's prior DIB and SSI applications. Id. at 107-15.

In his prior applications, Plaintiff alleged an onset date of August 15, 2006. Id. at 107. The ALJ concluded that Plaintiff had not been under a disability from the alleged onset date through the date of his decision, October 14, 2009. Id. at 114-15. Plaintiff did not request review. After initially alleging a disability onset date of April 1, 2006, Plaintiff amended his onset date to October 15, 2009, the day after the prior ALJ's decision. Id. at 310.

On November 11, 2009, Plaintiff visited Rodney S. Adams, a nurse practitioner at the CCC for a scheduled psychiatric follow-up appointment. Id. at 360, 490. Plaintiff had a prior diagnosis of alcohol dependence, although he reported abstention from alcohol beginning January 24, 2009. Id. At that time, Plaintiff had also been assessed with a bipolar disorder diagnosis. Id.

On a June 10, 2010 disability report, Plaintiff described his inability to work as due to hydrocephalus, scoliosis, HIV, COPD, and depression. Id. at 265. On a June 23, 2010 function

report, Plaintiff wrote that his ability to work was limited by HIV, multiple scoliosis, COPD, depression, and acid reflux. Id. at 270. Plaintiff checked boxes reflecting that these conditions negatively affected his ability to lift, bend, and climb stairs, as well as his memory, concentration, and ability to follow instructions. Id. at 275. As to his social activities, Plaintiff stated that he did not spend time with others and kept to himself since his conditions began. Id. at 274-75.

On a June 28, 2010 pain questionnaire, Plaintiff stated his back and stomach pain began in April 2006 and forced him to stay home. Id. at 278-79. Plaintiff also stated that the pain was consistent and was brought on by lying down, but relieved by Aleve and a heating pad. Id. On a June 29, 2010 work history report, Plaintiff wrote that he worked as a housekeeper for a hotel from 1990 until 2003. Id. at 280. Plaintiff worked forty hours each week, frequently lifting and carrying items not exceeding ten pounds, such as sheets, blankets, and towels. Id. at 281-82. In an eight-hour day, Plaintiff stated that he would: walk, stand, kneel, and crouch for eight hours; crawl and handle big and small objects for four hours; and sit or climb for one hour. Id.

On July 12, 2010, Plaintiff reported to the CCC for scheduled follow-up appointments with Adams and Terry Davidson. Id. at 486-89. Adams noted that Plaintiff reported drinking "one beer per week." Id. at 486. Davidson reported that Plaintiff was "upset as he was turned down for disability." Id. at 487. In addition to a diagnosis of bipolar disorder, Davidson's report lists diagnoses of HIV-1 infection, COPD, hypertension, and gastroesophageal reflux disease. Id. at 488. Davidson's report also listed a possible diagnosis of hydrocephalus stemming from "frequent headaches" and scoliosis. Id. Plaintiff was "having a lot of coughing with wheezing," and reported fatigue, heartburn, joint pain, cough, decreased exercise tolerance, sputum production, wheezing, and difficulty breathing on exertion. Id. 487-89. Plaintiff had been unable to get his Albuterol inhaler refilled and

restarted smoking cigarettes, averaging ten per day. Id. at 488-89. Plaintiff's breathing improved after

Davidson administered routine respiratory medication. Id. Regarding Plaintiff's HIV, Davidson

reviewed laboratory reports from August 18, 2009, that reflected a CD4 count of 477 and a viral load

of 2,770 copies per milliliter. Id. at 487.

On August 16, 2010, Plaintiff visited Dr. Robert Doran for a psychological evaluation as part

of the disability determination. Id. at 475-77. After observing Plaintiff and conducting a clinical

interview, Dr. Doran diagnosed Plaintiff with major depressive disorder, recurrent, moderate. Id. Dr.

Doran reported that Plaintiff had mild limitations in interacting with others and understanding and

remembering, a moderate limitation in sustained concentration and persistence, and a mild to

moderate limitation in adapting to changes or requirements. Id. at 477. Dr. Doran noted that Plaintiff

was "reticent and repeated prompting was necessary to obtain information," but he considered

Plaintiff to be "an adequate historian." Id. at 475. Plaintiff reported that he did not use tobacco or

drink alcohol. Id. at 476. Dr. Doran also opined that Plaintiff was "of low average intellectual

functioning." Id. at 477.

On August 18, 2010, Plaintiff visited Dr. Bruce Davis at Corporate Services, Inc., for a

consultative examination. Id. at 479-82. Dr. Davis relied on Plaintiff for his medical history and did

not review any of Plaintiff's medical records. Id. at 479. Plaintiff reported that he did not drink

alcohol and stopped smoking cigarettes in 2009. Id. at 480. Dr. Davis's diagnoses were hypertension,

hydrocephalus, cigarette associated lung disease, HIV infection, back and shoulder pain, as well as

anxiety/depression. Id. at 481. Dr. Davis listed Plaintiff's work-related physical limitations as: lifting

twenty pounds frequently; carrying ten-to-twenty pounds frequently; sitting for one-to-two hours at

one time and six hours total in an eight-hour work day; standing or walking for one hour at one time

and four hours total in an eight-hour work day; limited overhead reaching, squatting, climbing; and limited exposure heights, uneven terrain extreme heat or cold, and irritating inhalants. Id. at 481.

On September 2, 2010, Plaintiff returned to the CCC for a psychiatric follow-up appointment with Rodney Adams. Id. at 485. Plaintiff reported abstinence from alcohol for the past one and a half months. Id.

On September 9, 2010, Dr. Thomas Neilson performed a Psychiatric Review Technique as part of Plaintiff's disability determination. Id. at 513-25. Dr. Neilson concluded that Plaintiff's bipolar disorder and history of alcohol dependence did not constitute severe impairments. Id. at 513, 516, 521. Dr. Neilson also stated that Plaintiff was mildly limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. Id. at 523. Dr. Neilson noted that "change has not occurred" since Plaintiff's previous disability determination. Id. at 525. Dr. Neilson completed a Medical Consultant Analysis and concluded that the ALJ's prior decision should be adopted because Plaintiff's medical condition had not significantly changed. Id. at 509-12. Dr. Neilson opined "due to [history of] evasiveness and possible malingering, [claimant's] report is considered to be only partially credible." Id.

On October 27, 2010, Plaintiff returned to the CCC for a follow-up appointment with Terry Davidson. Id. at 587-90. Davidson's report lists assessments of HIV, alcoholism, gastric erosions, scoliosis, and COPD and allied conditions. Id. at 588. Plaintiff was experiencing coughing and wheezing. Id. Plaintiff reported that he was not drinking alcohol, but was smoking half a pack of cigarettes per day. Id. at 587. Davidson reviewed laboratory reports from July 12, 2010, that listed a CD4 count of 528 and a viral load of 8,420 copies per milliliter. Id. at 587, 590.

On November 10, 2010, Dr. Susan Warner completed a Physical RFC Assessment as part

of the disability determination. Dr. Warner found that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for about six hours in an eight-hour work day; and sit (with normal breaks) for about six hours in an eight-hour work day. Id. at 532. Dr. Warner also stated that Plaintiff had occasional limitations climbing, balancing, stooping, kneeling, crouching, and crawling. Id at 533. Dr. Warner noted that Plaintiff should avoid areas with poor ventilation and concentrated exposure to fumes, odors, dusts, and gases. Id. at 535. Dr. Warner explained that the difference between her findings and Dr. Davis's August 2010 findings was "based on few abnormal findings which support the degree of function limitations alleged or found." Id. at 539. Dr. Warner also opined that "[claimant's] allegations are not fully credibly limiting based on pain, with mild-mod scoliosis, no intensive treatment for headaches or COPD, HTN and HIV+ w/o EOD." Id. Dr. Warner concluded that the prior ALJ's decision should be adopted because Plaintiff's medical condition had not significantly changed. Id. at 527-30, 539.

On November 15, 2010, a vocational consultant completed a vocational analysis, concluding that Plaintiff could: lift a maximum of twenty pounds, or ten pounds frequently; stand or walk for six hours per day; and sit for six hours per day. Id. at 285-87. Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. Id. The vocational consultant found that Plaintiff should avoid areas with poor ventilation and concentrated exposure to fumes, odors, dusts, and gases. Id. The report reflects no mental limitations. Id. The vocational consultant stated that Plaintiff could not perform past work as a housekeeper, but had the capacity to perform work including storage facility rental clerk, laboratory sample carrier, and carder. Id. at 286-87. The vocational consultant assessment included a "Drummond and Dennard Acquiescence Rulings Rationale" that stating since the prior ALJ's decision "new evidence does not

show significant change has occurred." Id. at 284.

On November 18, 2010, the SSA denied Plaintiff's applications for DIB and SSI benefits. Id. at 123-30. On December 31, 2010, Plaintiff's insured status under Title II expired.

On February 21, 2011, Plaintiff visited Robertson Nash, a nurse practitioner at the CCC for a follow-up appointment. Id. at 583-85. Nash's report lists assessments of syncopal episodes and HIV. Id. at 585. Plaintiff complained of four to five daily near-syncopal episodes over the past two weeks, with difficulty seeing out of his right eye, and depression due to family troubles. Id. at 583. Nash noted that Plaintiff was diagnosed with COPD and smoked one pack of cigarettes per day, yet the "social history" section of Nash's report lists that Plaintiff drank alcohol socially and stopped smoking cigarettes in 2005 after a one pack-per-day habit over twenty years. Id. at 584. Nash discussed with Plaintiff the parameters for beginning HIV treatment with antiretroviral therapy ("ART"). Id. at 585.

On March 1, 2011, Plaintiff completed a disability report on appeal, writing that his condition had deteriorated since the June 2010 disability report because he had slightly blurred vision in his right eye. Id. at 290-95. Plaintiff reaffirmed that he visited the CCC for treatment of HIV, acid reflux, hydrocephalus, high blood pressure, COPD, and depression. Id. at 291. Plaintiff listed his medications as geodon, hydrochlorot, Nexium, and setraline. Id. at 292. Plaintiff also reported that he could not stand or walk too long due to shortness of breath and that he stayed indoors most of the time. Id. at 293.

On March 4, 2011, Plaintiff went to the CCC for an unscheduled walk-in visit complaining of feeling unwell for the past week. Id. at 580-82. Nash diagnosed Plaintiff with an upper respiratory tract infection and prescribed ciprofloxacin for treatment of his symptoms. Id. at 582. Plaintiff

9

reported dark yellow mucous and feeling "like he is choking at night with yellow sputum." Id. at 580. Plaintiff also reported fatigue, fever, chills, night sweats, dizziness and headaches. Id. Finally, Plaintiff reported "pain in the center of his chest that is worse after a coughing spell." Id. The "social history" section of Nash's report regarding alcohol and cigarette use is unchanged from the visit of February 21, 2011. Id. at 581, 584. Nash noted that Plaintiff was "very interested" in starting ART for his HIV. Id. at 582.

On March 10, 2011, Plaintiff completed a function report and complained of depression and frequent back pain. Id. at 296-303. Plaintiff wrote that his conditions caused him to stay to himself, forego walking long distances, and to have trouble handling money because of difficulty counting. Id. at 297-301. Plaintiff checked boxes listing limitations in his ability to lift, bend, stand, and walk, as well as concentrate, remember, and follow instructions. Id. at 301. Plaintiff wrote that he could walk one-half mile or less before needing to stop and rest, and required special reminders to eat meals because he is forgetful and could only pay attention for five minutes Id. at 298. Plaintiff also stated that he was able to clean the house, perform personal care, do laundry, and use public transportation without assistance. Id. at 298-99.

On April 11, 2011, two doctors reviewed Plaintiff's DIB and SSI claims as part of Plaintiff's request for reconsideration. Id. at 540-41. Dr. Jayne Dubois reviewed Plaintiff's psychological condition and affirmed Dr. Neilson's Psychiatric Review Technique of September 9, 2010, and the prior ALJ's decision that Plaintiff was not disabled. Id. at 540. Dr. Kanika Chaudhuri reviewed Plaintiff's physical condition and also affirmed Dr. Neilson's medical consultant analysis and adopted the prior ALJ's decision that Plaintiff was not disabled. Id. at 541. On April 12, 2011, vocational examiner J. Montgomery completed a vocational analysis and found that Plaintiff's RFC

was unchanged from the prior vocational analysis of November 15, 2010. Id. 285, 304-06. On April

12, 2011, the SSA denied Plaintiff's claims after reconsideration. Id. at 137-44.

On April 23, 2011[2], Plaintiff completed another disability report on appeal, writing that his

condition had changed since the March 2011 disability report because he "had to start HIV Meds."

Id. at 249-59. Plaintiff also reported that his ability to care for personal needs was impacted by

shortness of breath, fatigue, and confusion. Id. at 253.

On June 6, 2011, Plaintiff returned to the CCC for a scheduled appointment with Nash after

recently starting ART. Id. at 576-579. Plaintiff reported that he was not feeling well and was having

trouble with his COPD. Id. at 576. Plaintiff was using his inhaler daily and stated that his shortness

of breath was weather-related. Id. at 578. Plaintiff also reported night sweats and diarrhea. Id.

Plaintiff stated that he was "drinking beer on a regular, but not nightly basis" and denied drinking

any liquor. Id. The "social history" section of Nash's report was not updated from previous visits.

Id. at 577, 581, 584.

On October 5, 2011, Plaintiff again returned to the CCC for a follow-up appointment with

Nash, a nurse practitioner. Id. at 571-74. Plaintiff was taking ART and did not report any side effects.

Id. at 573. Plaintiff stated that he was rarely using his inhaler, but was experiencing wheezing that

he expected to worsen with the cold weather. Id. at 571, 573. Plaintiff reported smoking half a pack

of cigarettes per day at that time, yet the "social history" section on Nash's report was not updated

---

[2]Plaintiff listed the date on this disability report as April 23, 2010, rather than the more likely correct date of April 23, 2011. On the form, Plaintiff reports an approximate start date for "HIV Meds" as March 1, 2011. Id. at 249. This is later than the listed completion date of the form, and corresponds with notes from Plaintiff's March 2011 visit at the CCC indicating that Plaintiff would begin ART as soon as possible. Id. at 582. Thus it is likely that Plaintiff mistakenly listed the year as 2010 rather than 2011 on the form. Id. at 256.

from previous visits to reflect this information. Id. at 572, 573, 577, 581, 584.

On November 30, 2011, Plaintiff returned to the CCC for a routine mental health appointment, but complained of severe abdominal pain over the previous three days and dizziness beginning that morning. Id. at 564-66. Plaintiff stated that he was doing a good job managing his alcohol intake, yet the "social history" section on Nash's report remained unchanged. Id. at 564, 565, 572, 577, 581, 584. Due to Plaintiff's presentation and his complicated gastrointestinal history, Nash referred Plaintiff to the Vanderbilt University Medical Center ("VUMC") Emergency Department. Id. at 566.

Plaintiff was admitted to the VUMC emergency room on November 30, 2011, and discharged on December 2, 2011. Id. at 553. On November 30, Dr. Charles Neck examined Plaintiff and found that he had "a 3-day history of right-sided . . . epigastric pain which he describes as an 8/10 in intensity and which came on fairly suddenly initially and has remained constant since." Id. at 567. Plaintiff's pain was "worsened by positional changes and relieved when lying still." Id. Plaintiff reported smoking less than a pack of cigarettes per day and denied heavy alcohol use. Id. After reviewing various labs and images, Dr. Neck diagnosed Plaintiff with acute abdominal pain, moderate hiatal hernia and small diaphragmatic hernia containing liver, tiny amount of free fluid in the right pelvis, HIV, lightheadedness, and nausea. Id. at 568. At discharge on December 2, Dr. Anas Abou-Ismail reported that Plaintiff's pain began improving on November 30, but he was kept overnight because of elevated liver function tests ("LFTs"). Id. at 553-54. Plaintiff's LFTs normalized on December 1, but required outpatient follow-up. Id. at 554. Dr. Abou-Ismail noted that Plaintiff did not report any history of alcohol abuse. Id.

On March 28, 2012, Plaintiff visited the CCC for a scheduled appointment with Nash. Id. at

548-51. Nash noted that Plaintiff was doing well with his ART, without any side effects. Id. at 550. Plaintiff stated that he had one beer in the past week and was "aware that relapse is a real danger for him." Id. at 548, 550. Plaintiff also stated that he was smoking a half pack of cigarettes per day, yet the "social history" section of Nash's report was not updated from previous visits to reflect this information. Id. at 548-49, 550, 565, 572, 577, 581, 584.

On June 20, 2012, Plaintiff returned to the CCC for an appointment with Nash. Id. at 544-47. Nash again noted that Plaintiff was doing well with his ART, without any noted side effects. Id. at 546. Plaintiff reported that he had not consumed alcohol in three days, but drinks three-to-four quarts of beer each week, which is less than in the past. Id. at 544. Nash noted that Plaintiff had previously been to "rehab" four times. Id. Yet, the "social history" section on Nash's report was not updated from previous visits to reflect this information.. Id. at 545, 549, 565, 572, 577, 581, 584.

On August 17, 2012, Plaintiff went to the CCC for an unscheduled walk-in visit complaining of feeling unwell for the past two weeks. Id. at 629-31. Plaintiff reported fatigue, body aches, dizziness, night sweats, nausea, and diarrhea. Id. at 629. Plaintiff also had shortness of breath at rest and bad coughing with occasional discharge. Id. Nash also noted significant wheezing. Id. at 631. Plaintiff reported smoking less than one pack of cigarettes per day, though this was not reflected in the "social history" section. Id. at 629-30. Nash referred Plaintiff to the VUMC emergency room. Id. at 631.

Plaintiff was admitted to the VUMC emergency room on August 17, 2012, and discharged on August 21, 2012. Id. at 598. Dr. Michelle Walther examined Plaintiff on August 17 and noted shortness of breath as his chief complaint. Id. at 619. After reviewing various laboratory reports and images, Dr. Walther diagnosed Plaintiff with acute pancreatitis, acute COPD exacerbation, diarrhea,

nausea and vomiting. Id. at 623. Although Plaintiff responded well to initial treatments, Dr. Walther admitted Plaintiff to VUMC given his range of symptoms and medical history. Id.

Dr. Stacey Tillman examined Plaintiff on August 17 and noted that his presentation was consistent with COPD exacerbated by viral illness. Id. at 617. Plaintiff reported abdominal pain and one episode of chest pain that lasted five minutes and "went away on its own." Id. at 613. Regarding Plaintiff's HIV infection, Dr. Tillman reviewed Plaintiff's laboratory reports from June 24, 2012, that indicated a CD4 of 674 and an undetectable viral load. Id. at 614. Plaintiff reported that he smoked half a pack of cigarettes per day and "drinks beer about twice a week, usually 2 quarts (2 40 ounce drinks)." Id. On August 18, 2012, Monique Simpson, a medical student concluded that because Plaintiff had a CD4 count greater than 600 and a history of COPD and smoking, "it is likely that he contracted a viral illness that has caused a COPD exacerbation." Id. at 611-12. Dr. Victoria Burke authorized Plaintiff's discharge on August 21, noting that Plaintiff's presentation was "due to a COPD exacerbation likely due to a suspected viral [illness] in the setting of medication noncompliance (as he had run out of his albuterol inhaler)." Id. at 598. Dr. Burke also noted that Plaintiff "clinically improved on steroids, azithromycin, and nebulizer treatments." Id.

On September 19, 2012, Plaintiff visited the CCC for a post-hospital follow-up appointment with Nash. Id. at 593-96. Plaintiff had "paperwork for disability" with him at the appointment. Id. at 593. Plaintiff reported that he was feeling good and "only drinking [one] beer per day," though the "social history" section on Nash's report was not updated from previous visits to reflect this information.. Id. at 545, 549, 565, 572, 577, 581, 584, 593-94. Nash reported that Plaintiff was doing well on ART, with no noted side effects. Id. at 595.

On October 31, 2012, Nash completed a Treating Physician Statement that Plaintiff would

not be able to engage in sedentary work for eight hours per day, five days per week because his combination of conditions left him chronically tired and the medical side effects were unpredictable. Id. at 632-33. Nash noted that fatigue was a prominent component of Plaintiff's HIV infection. Id. at 632. Nash also stated that Plaintiff slept approximately six hours per night and required naps during the day, but neither left Plaintiff feeling rested or refreshed. Id. According to Nash, Plaintiff did not experience any side effects from his medication. Id. Nash reported that Plaintiff began experiencing chronic malaise, pain, and nausea, with occasional fever and night sweats in 2009. Id. at 633. Finally, Nash noted that these conditions caused Plaintiff to have marked limitations in his activities of daily living, his social functioning, and completion of tasks in a timely manner due to deficiencies in concentration, persistence, or pace. Id.

At the hearing before the ALJ, Plaintiff described suffering from back problems stemming from scoliosis, memory lapses and headaches stemming from hydrocephalus, COPD, and a lazy eye. Id. at 41-53, 56-62. Plaintiff testified that he was hospitalized for back pain and COPD complications in 2011, and stomach pain and COPD complications in 2012. Id. at 59-62. Plaintiff also testified that he completed eighth grade and obtained a GED. Id. at 45. Regarding work limitations, Plaintiff expressed that he could alternate between sitting one hour and standing the next hour for four hours before needing to lay down with a heating pad for an hour and a half to relieve back pain. Id. at 47-48. Plaintiff also expressed that he could comfortably lift fifteen pounds for about four hours of the day. Id. at 48-49. Regarding his last period of substantial gainful activity, Plaintiff testified that he cleaned rooms and vacuumed hallways for a hotel from 1990 until 2003. Id. at 66-68.

The ALJ questioned Plaintiff regarding his alcohol use. Id. at 53-56. Plaintiff testified that he was not an alcoholic, although he had been diagnosed as alcohol dependent. Id. at 54. Plaintiff

15

also testified that he stopped drinking in September 2012 without the help of a treatment program. Id. at 51, 55-56. Plaintiff stated that, before he stopped drinking, he drank one twenty-four ounce beer, but the ALJ did not ask how frequently. Id. at 55-56. The ALJ asked Plaintiff if he told Nash in June 2012 that he was drinking about three to four quarts of beer per week. Id. at 56. Plaintiff responded that he had informed Nash that Plaintiff was drinking one or two twenty-four ounce beers every three or four days. Id.

The ALJ posed a series of hypothetical questions to vocational expert Gail Ditmore, asking whether an individual of Plaintiff's age, education, work experience, and RFC level could perform any jobs that exist in the national economy. Id. at 68-72. The ALJ adopted the second construction of Plaintiff's RFC in the fifth finding of fact and conclusion of law in the decision denying Plaintiff's claims. Id. at 18-27, 68-72. Based on these limitations, Ditmore testified that Plaintiff could not perform his prior work activity as a housekeeper because it would not allow for alternating every hour and there is exposure to concentrated respiratory irritants. Id. at 68-69. Ditmore stated, however, that Plaintiff could perform other jobs that exist in the national economy, such as assembler, sorter, and production worker. Id. at 68-72.

## B. Conclusions of Law

The Social Security Act defines "disability" as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the entire record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th

Cir. 1991). Judicial review is limited to a determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

"A decision concerning a claimant's eligibility for social security benefits is an 'initial determination' under the social security regulations. An initial determination is binding unless the claimant requests reconsideration or the Commissioner revises its decision." Drummond v. Comm'r of Soc. Sec., 126 F.3d 837, 841 (6th Cir. 1997). Plaintiff did not request a review of the first ALJ's decision. Thus, ALJ Garrison's decision is the final determination of Plaintiff's disability claims from August 15, 2006 to October 14, 2009. This determination is "subject to the doctrine of administrative res judicata. [. ..] Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." Id. at 841-42. See also Dennard v. Sec'y of Health and Human Servs., 907 F.2d 598, 600 (6th Cir. 1990) (per curiam) (holding that a second ALJ was precluded from reconsidering a prior ALJ's finding regarding claimant's ability to perform past relevant work).

The second ALJ adjudicated the claims at issue in this action. (Docket Entry No. 11 at 8-75).

17

Noting Dennard and Drummond, the ALJ stated that the current evidence supported the prior ALJ's

findings that Plaintiff had severe impairments of HIV infection, headache disorder, COPD, and

scoliosis. Id. at 14. Yet, the ALJ found that there was new and material evidence to support findings

that Plaintiff had developed two additional severe impairments since the previous ALJ's decision:

major depressive disorder and alcohol dependence. Id. As the ALJ explained, "[b]ecause this change

alone affects all later steps in the sequential evaluation process, it follows that I am not bound by the

findings of the prior ALJ with respect to any finding which uses or relies upon the claimant's

residual functional capacity." Id.

The period of time after a prior ALJ's decision through a subsequent ALJ's decision is called

the unadjudicated period. The unadjudicated period for Plaintiff's claims is October 15, 2009

through November 30, 2012. Plaintiff's insured status under Title II expired on December 31, 2010.

The second ALJ noted that Plaintiff's level of impairment before and after this date may have

differed, but opted to apply a uniform RFC for Plaintiff's DIB and SSI claims that included mental

limitations: "[F]or the purposes of this decision, I shall adopt the more restrictive residual functional

capacity that was found during the post-DLI period, thus applying it throughout the entire

unadjudicated period." Id. at 22. As to Plaintiff's RFC, the ALJ found:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) and 416.967(b), including the ability to lift and/or carry 20 pounds
> occasionally and 10 pounds frequently, sit for about six hours, stand and/or walk for
> about six hours, except as follows: The claimant is limited to jobs requiring only
> occasional posturals of climbing, balancing, stooping, crouching, kneeling, or
> crawling, and is to avoid exposure to pulmonary irritants (such as fumes, odors,
> dusts, gasses, or similar items). From a mental perspective, the claimant is further
> limited to simple and unskilled jobs that requiring [sic] no more than the ability to
> understand, remember and carry out one to three step instructions. He would be able
> to maintain concentration, persistence and pace for such jobs for two hours at a time

with customary work breaks.

Id. at 18-19.

Plaintiff argues that the ALJ erred in three ways: (1) the ALJ failed to include a function-by-function assessment in Plaintiff's RFC as required by SSR 96-8p; (2) the ALJ did not consider properly the opinion of Nash, the nurse practitioner as required by SSR 06-3p and decisional law; and (3) the ALJ's credibility analysis of Plaintiff was improper. (Docket Entry No. 14-1 at 1)

Plaintiff asserts that the ALJ did not comply with the requirement in SSR 96-8p that an ALJ complete a function-by-function analysis because he did not include pushing or pulling limitations in Plaintiff's RFC. Id. at 6. SSR 96-8p provides that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." The physical abilities that must be assessed include "sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)." 20 C.F.R. §§ 404.1545(b), 416.945(b). SSR 96-8p also states "[w]here there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." In essence, "[a]lthough SSR 96-8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." Delgado v. Comm'r of Soc. Sec., 30 F. App'x 542, 547 (6th Cir. 2002).

Here, the ALJ's RFC analysis included physical restrictions for sitting, standing, walking,

lifting, carrying, as well as the postural functions of climbing, balancing, stooping, crouching, kneeling, and crawling. (Docket Entry No. 11 at 18-19). Plaintiff is correct that the ALJ did not mention pushing or pulling limitations. Id. Yet, for the unadjudicated period, Plaintiff did not allege any restrictions in pushing or pulling. Plaintiff did not cite difficulty in pushing or pulling in either function report he completed for use in the disability determination. Id. at 275, 301. None of the limitations in the reports of the consultative examiner, vocational examiner, or medical consultant listed pushing or pulling. Id. at 285, 481, 532. Although Plaintiff testified at the hearing that he suffered from severe back pain, he did not mention pushing or pulling when describing how the pain affected him. Id. at 41-42, 46-49. Because Plaintiff did not allege pushing or pulling as limitations, the Court concludes that ALJ Gregori was not required to discuss those capacities in Plaintiff's RFC. See Delgado, 30 F. App'x at 547.

Next, Plaintiff argues that ALJ Gregori erred by assigning "very little weight" to the Treating Physician Statement of Robertson Nash, a nurse practitioner. (Docket Entry No. 14-1 at 6-9). Plaintiff specifically argues that the ALJ ran afoul of SSR 06-3p and related decisional law by failing to consider properly the record as a whole when evaluating Nash's opinion. Id. at 9. The Commissioner contends that "the ALJ properly evaluated Mr. Nash's opinion and found it inconsistent with the record." (Docket Entry No. 15 at 13). In part, the Commissioner argues that the ALJ properly noted Nash's lack of explanations for certain limitations. Id. at 14. In response, Plaintiff cites SSR 96-5p for the proposition that Nash's status as a treating source required the ALJ to contact Nash for further information if he were unsatisfied with Nash's explanations. (Docket Entry No. 16 at 3). If Plaintiff is successful in his argument that the ALJ should have requested more information from Nash before assigning his opinion "very little weight," the ALJ's entire analysis

of Nash's opinion would be suspect. Thus, the Court addresses this point first.

SSR 96-5p stipulates certain requirements for recontacting treating sources: "[b]ecause treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." SSA regulations define a "treating source" as an "acceptable medical source" who has had an ongoing treatment relationship with a patient. 20 C.F.R. §§ 404.1502, 416.902. "Acceptable medical sources" include many types of licensed medical providers, but do not include nurse practitioners. See 20 C.F.R. §§ 404.1513(a), 416.913(a). Because Nash is a nurse practitioner, he does not qualify as a "treating source" under SSA regulations and Plaintiff's reliance on SSR 96-5p on this point is misplaced.

Turning to the ALJ's substantive evaluation of Nash's opinion, SSR 06-3p gives ALJs guidance on how to consider opinions from health care providers who are not "acceptable medical sources" under SSA regulations, such as nurse practitioners. See 20 C.F.R. §§ 404.1513(a), 416.913(a). This ruling provides that ALJs should evaluate opinions from "other sources" who have seen an individual in their professional capacity using the same factors they use to evaluate opinions from "acceptable medical sources." Such factors include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.

Plaintiff asserts that the ALJ did not consider the record as a whole because he cited treatment notes from September 2012 illustrating that Plaintiff's symptoms were under control but ignored records from August 2012 showing that Plaintiff appeared ill. (Docket Entry No. 14-1 at 8, Docket Entry No. 16 at 2). The ALJ did not ignore the August 2012 visit and addressed it in detail:

> [O]n August 17, 2012, [Plaintiff] alleged body aches, dizziness, coughing with prurient discharge, a general worsening of COPD symptoms, and a brief episode of chest pain, all in the setting of his running out of albuterol. He was directed to Vanderbilt's emergency department following a nebulizer treatment. There, his initial diagnoses included acute pancreatitis and acute COPD exacerbation (with lab reports remarkable for an elevated lipase level), but the pancreatitis was later viewed as highly unlikely and it was felt instead that he had viral gastroenteritis. His chest pain was considered muscular rather than cardiac in origin, secondary to his coughing. Also of note, his HIV viral load was undetectable. Reportedly, he was drinking two quarts of beer weekly at this point. He was released after five days after improvement following a course of antibiotics, steroids, and nebulizer treatments.

(Docket Entry No. 11 at 23). Thus, Plaintiff's contention is incorrect.

Moreover, the ALJ analyzed Nash's Treating Physician Statement for consistency with the record as a whole and stated that "there are far too many disconnects between Mr. Nash's opinions and the underlying medical evidence (including his own treatment notes) to be able to ignore them." (Docket Entry No. 11 at 24). On his Treating Physician Statement, Nash made checkmarks signifying that Plaintiff's conditions caused him marked limitation in the three areas: activities of daily living, abilities to maintain social functioning, and ability to complete tasks in a timely manner due to concentration, persistence, or pace. Id. at 633-34. The ALJ noted that Nash did not provide any explanation for these limitations. Id. at 23.

The ALJ also performed a "paragraph B" mental function analysis that addressed these areas of limitation. Id. at 17-18. The ALJ assessed Plaintiff with only mild limitations in activities of daily living and social functioning, as well as moderate difficulties in maintaining concentration,

persistence, or pace. Id. at 17-18. Regarding activities of daily living, the ALJ adopted the prior

ALJ's decision:

> In the original decision, the ALJ cited to the claimant's ability to take care of all of
> his personal needs, cook, clean, and perform laundry. The claimant also admitted that
> he is able to go to a store as needed and to use public transportation on an unassisted
> basis. On the current record, I am unable to discern any substantial change, because
> he continues to report these activities . . . .

Id. Although the ALJ considered Plaintiff's complaints on his June 2010 Function Report that it was

taking him longer to dress and bathe, he noted that Dr. Doran's August 2010 psychological

evaluation noted "fairly robust" activity in these areas. Id. at 17, 271, 476. Regarding social

functioning, the ALJ again adopted the prior ALJ's decision after reviewing the entire record, stating

"[b]oth historically, and in the present evaluation, the impression [Plaintiff] gave to the evaluator

was of someone who had no worse than mild difficulties . . . . [O]ne does not appreciate significant

change in this respect." Id. at 17. Compared to the prior ALJ's decision, the ALJ found Plaintiff's

restriction in concentration, persistence, or pace had worsened from mild to moderate. Id. at 18. The

ALJ explained "[a]t the time of the original decision, it appears the sole basis for concluding the

claimant had mild limitations was that he enjoyed reading." Id. The ALJ noted that since that time,

Dr. Doran diagnosed Plaintiff with Major Depressive Disorder and assessed Plaintiff as moderately

limited in sustained concentration and persistence. Id. at 18, 477.

The ALJ also found that Nash's opinion regarding "the nature and severity of [Plaintiff's]

HIV-related symptoms" was inconsistent with the record. Id. at 25. Nash made checkmarks

signifying that fatigue is a prominent component of Plaintiff's HIV disease and that Plaintiff requires

naps during the day. Id. at 632. Nash also opined that Plaintiff experiences occasional fever and night

sweats, with chronic malaise, pain, and nausea. Id. at 633. As to this malaise, the ALJ accounted for

23

the presence of depressive symptoms in Plaintiff's RFC by including mental limitations, noting "I provided less weight to the non-examining mental evaluations [by Drs. Neilson and Dubois], as objective observations during the consultative examination [by Dr. Doran] were sufficient to support the mental limitations identified [in Plaintiff's RFC]." Id. at 27.

As to physical "HIV-related" symptoms, Nash's treatment notes do not list them as chronic. Nash saw Plaintiff at the CCC nine times between February 24, 2011 and September 19, 2012. Id. at 583, 593. Plaintiff only complained of fatigue at two of the nine meetings, on March 4, 2011 and August 17, 2012. Id. at 580, 629. Plaintiff also reported fever and night sweats at these appointments. Id. Both instances coincided with respiratory infections that improved after treatment, although the latter did result in hospitalization. Id. at 582, 598. As to pain and nausea, Plaintiff reported both on November 30, 2011 and August 17, 2012. Id. at 566, 631. Nash referred Plaintiff to the Vanderbilt emergency room on each occasion, and each time those symptoms were largely resolved at discharge. Id. at 553, 598. Plaintiff reported chest pain without nausea at one appointment on March 4, 2011, but that was related to the above-mentioned respiratory infection. Id. at 580. Plaintiff also made an isolated complaint to Nash regarding night sweats on June 6, 2011. Id. at 576. In the CCC's records of physical symptoms during the unadjudicated period prior to Nash beginning treatment, Plaintiff made only one complaint of fatigue and joint pain to Terry Davidson on July 12, 2010. Id. at 487.

Nash also made a checkmark that Plaintiff would not be able to engage in sedentary work on a sustained and unpredictable basis. Id. at 632. Nash explained that Plaintiff's combination of conditions left him chronically tired and medical side effects were unpredictable. Id. at 633. Although Plaintiff's medical records from the unadjudicated period reflect occasional complaints

of fatigue, fever, night sweats, pain, and nausea, these symptoms were not chronic and were quickly

resolved after treatment. Thus, the Court concludes that substantial evidence supports the ALJ's

decision to assign "very little weight" to Nash's Treating Physician Statement.

Finally, Plaintiff argues that ALJ Gregori did not fulfill the requirements of SSR 96-7p

because he failed to evaluate and assess adequately Plaintiff's credibility. (Docket Entry No. 14-1

at 9-11). SSR 96-7p explains that ALJs should follow a two-step process for evaluating an

individual's own description of his or her impairment:

> First, the adjudicator must consider whether there is an underlying medically
> determinable physical or mental impairment(s) . . . that could reasonably be expected
> to produce the individual's pain or other symptoms. . . . Second, . . ., the adjudicator
> must evaluate the intensity, persistence, and limiting effects of the individual's
> symptoms to determine the extent to which the symptoms limit the individual's
> ability to do basic work activities. For this purpose, whenever the individual's
> statements . . . are not substantiated by objective medical evidence, the adjudicator
> must make a finding on the credibility of the individual's statements based on a
> consideration of the entire case record.

When analyzing the credibility of an individual's statements, the ALJ must consider: the claimant's

daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating

and aggravating factors; the type, dosage and effect of medication; and other treatments or measures

to relieve pain, as reflected in the medical records. See Felisky v. Bowen, 35 F.3d 1027, 1039 (6th

Cir. 1994) (construing 20 C.F.R. § 404.1529(c)(2)). "An ALJ may discount a claimant's credibility

when the ALJ 'finds contradictions among the medical reports, claimant's testimony, and other

evidence.'" Steagall v. Comm'r of Soc. Sec., 596 Fed.Appx. 377, 381 (6th Cir. 2015) (quoting

Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 392 (6th Cir. 2004)).

Here, the second ALJ found that "many of the claimant's alleged symptoms and functional

limitations are not supported by the objective medical records, and therefore, are given very little

weight." (Docket Entry No. 11 at 20). The ALJ found that "Plaintiff's inconsistent statements regarding his alcohol usage only serve to undermine his credibility in a general or overall sense," although he did accept Plaintiff's testimony that he did not use alcohol at the time of the hearing. Id. at 15, 26. The ALJ also found many alcohol-related inconsistencies in Plaintiff's statements throughout the unadjudicated period, including to consultative examiners in 2010, to his medical providers at various points from 2009 through 2012, and at the hearing in November 2012. Id. at 14-15. As an example, Plaintiff told consultative examiners in August 2010 that he did not drink alcohol, but his September 2010 self-report to his medical provider shows that Plaintiff only began to abstain from alcohol immediately prior to the examinations. Id. at 476, 480, 485. Regarding statements to medical providers, there is a December 2011 VUMC hospital record that Plaintiff had no history of alcohol abuse that is in contradiction to Plaintiff's June 2012 statement to Nash that he had previously been to "rehab" four times. Id. at 544, 554. Finally, Plaintiff testified at the hearing that he is not an alcoholic despite his medical records reflecting a diagnosis of alcoholism. Id. at 54, 588.

The ALJ also properly found that objective medical records do not support Plaintiff's statements at the hearing that severe back pain and memory lapses prevent him from working. Id. at 41-45. The ALJ noted that Plaintiff did not complain of musculoskeletal pain or neurological problems in CCC visits in March 2012 nor in his March, June, and October 2011 visits. Id. at 22, 548, 571, 576, 580. The ALJ also referenced the August 2010 consultative examination finding that Plaintiff had a "full range of motion throughout the entire spinal column, including at the lumbar region." Id. at 29, 480. The ALJ assessed Plaintiff's medical records, observed Plaintiff during his hearing, and reached a reasoned decision that is supported by substantial evidence. Thus, the ALJ's

decision not to accord full credibility to Plaintiff's statements was proper. See Steagall, 596 Fed.Appx. at 381.

For these reasons, the Court concludes that the ALJ's decision is supported by substantial evidence and should be affirmed and that Plaintiff's motion for judgment on the record (Docket Entry No. 14) should be denied.

An appropriate Order is filed herewith.

ENTERED this the 29th day of September, 2015.

William J. Haynes, Jr.
Senior United States District Judge